# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SEAN MICHALEZEWSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No.  05 C 3363 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| CSX TRANSPORTATION, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sean Michalczewski[1] ("Plaintiff" or "Michalczewski") brought suit against Defendant CSX Transportation, Inc. ("Defendant" or "CSXT") for negligence (Count I) and negligent infliction of emotional distress ("NIED") (Count II).  The case was removed to this Court pursuant to diversity jurisdiction and pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441(a).  Before this Court is Defendant's Motion for Summary Judgment (Doc. No. 15).  For the reasons stated below, Defendant's motion for summary judgment is GRANTED in part and DENIED in part.

---

[1] Plaintiff's appears to have been spelled incorrectly in the initial filings and that error is reflected in the name of the case.  This Court adopts the spelling "Michalczewski" used by Plaintiff in subsequent documents.

1. **FACTS**[2]

The railroad crossing at issue in this dispute is located in the Village of Alsip, Illinois, and intersects 123rd Street at approximately South Lombard Lane ("123rd Street Crossing"). Facts ¶ 4. The railroad line that traverses the 123rd Street Crossing is a double track mainline that generally extends in a northwest-southeast direction through the Village of Alsip.[3] *Id.* ¶ 5. The 123rd Street Crossing is equipped with automatic flashing light signals with standard half-roadway gates and bells controlled by DC circuitry. *Id.* ¶ 6. At this intersection, there are no automatic double roadway or pedestrian crossing gates. Add'l Facts ¶ 1.

The Illinois Commerce Commission ("ICC") classifies the track at the 123rd Street Crossing as Type 3 track. Facts ¶ 7. The 123rd Street Crossing is identified as #163574 in the United States Department of Transportation's/Federal Railroad Administration's ("FRA") national crossing inventory. *Id.* ¶ 11. On August 8, 1990, following a public the ICC found that the 123rd Street crossing safety mechanisms were appropriate and adequate. *See generally* Ex. 8. According to the FRA, the maximum time table speed established by the federal government for the 123rd Street Crossing on August 26, 2000 was 40 miles per hour. *Id.* ¶ 12.

---

[2]Plaintiff does not help his case by misconstruing the record. For example, Plaintiff claims that his right arm became "wrenched" or "severely twisted," but cites to transcript text that contains no such language. *See* Add'l Facts ¶ 12. Similarly, he maintains that his arm injury was treated on the day of the accident, but the cited page contains no support for this statement. *See* Michalczewski Tr. at 84 (mentioning only that he received "a quick physical").

[3]Despite this compass direction, the parties for the most part refer to the tracks and the trains on them as traveling to the north and to the south. This Court will adopt that language, referring to what are technically "northwestern bound" and "southeastern bound" trains as "northbound" and "southbound," respectively.

On the afternoon of August 26, 2000, Michalczewski and Christopher McKinney ("McKinney") approached the 123rd Street Crossing as they walked westbound along 123rd Street in Alsip, Illinois. *Id.* ¶ 14. When the two boys arrived at the 123rd Street Crossing, the crossing gates were down and a southbound train was traveling through the crossing on the westernmost track. *Id.* ¶ 16. While waiting for this southbound train to pass, Michalczewski and McKinney talked to one another, and were able to hear each other by raising their voices "a little bit. Not too much." *Id.* ¶ 18. The crossing gate began to raise, and without waiting for it to reach a fully upright position – while it was "still at an angle" – McKinney began to cross the tracks. *Id.* ¶ 19; Michalczewski Tr. at 150-51. As McKinney proceeded forward into the crossing, a second train operated by CSXT approached the 123rd Street Crossing from the south on the easternmost track. *Id.* ¶ 20.

Michalczewski saw and heard the northbound CSXT train approximately as he was reaching the plane of the crossing gate. *See* Michalczewski Tr. at 159-165. When Michalczewski first saw the CSXT train it was approximately eight to ten (8-10) car lengths away from the railroad crossing. *Id.* Michalczewski asserts that, upon seeing and hearing the approaching northbound train, he yelled to McKinney at least four times to get out of the crossing because a train was coming. *Id.* ¶ 23. Michalczewski asserts that McKinney looked back at him as if he was "messing around" and continued moving forward onto the railroad tracks. *Id.* ¶ 24. Michalczewski asserts that he thereafter went underneath the lowered crossing gate and toward McKinney to grab his friend's shirt to pull him out of the path of the oncoming northbound train. *Id.* ¶ 25. McKinney was struck bodily by the CSXT train. *Id.* ¶ 26. As a result of the impact, McKinney's body "grazed past" Michalczewski's arm. *Id.* ¶ 27.

Michalczewski believed that he was in potential danger after passing the crossing gate to rescue his friend. *Id.* ¶ 28.

At the time of the accident, Michalczewski was 13 years of age. *Id.* ¶ 15. He appears to have been aware of basic safety strategies for approaching train crossings, including: looking both ways before crossing train tracks; standing behind crossing gates if they are down; and waiting until the crossing gate goes completely up before proceeding into the crossing. *Id.* ¶ 17.

The only physical injury that Michalczewski asserts from the incident is that McKinney "grazed past" his right arm, *id.* ¶ 29, as a result of which the arm was "a little sore...it just had this weird felling in it, and it hurt." Michalczewski Dep. at 60-61. Michalczewski has never sought medical treatment for this injury. *Id.*

Michalczewski had, and continues to have, nightmares about the train crushing Chris, causing him to wake up trembling at night. Add'l Facts ¶ 16. He continues to feel guilty about the accident, believing he should have reacted faster and pulled McKinney away from the train. *Id.* Michalczewski met with a psychiatrist by the name of David L. McNeil, M.D. ("Dr. McNeil") on March 7, 2005. Facts ¶ 30. Michalczewski had one follow-up phone call with the doctor after that date. *Id.* Dr. McNeil diagnosed Michalczewski as suffering from "severe Post-traumatic Stress Disorder" ("PSD"), involving conditions he deemed "severe and pervasive enough that they continue to limit his level of functioning and quality of life." Add'l Facts ¶ 17. Michalczewski would consider returning to Dr. McNeil "if it came down to the point to where my parents ran out of suggestions and opinions, I guess if I needed someone to confide in, yeah," but is not otherwise currently seeking medical care for conditions that resulted from the accident. *See* Facts ¶ 30; Michalczewski Dep. at 81-83.

Plaintiff maintains that, as a result of the events of August 26, 2000, Defendant is liable for the injuries he suffered on the following theories: negligence (Count I); and negligent infliction of emotional distress (NIED) (Count II). Plaintiff's first count is brought according to nine alternative theories of negligence, according to which Defendant or its train operators failed:

- a) to have a properly functioning pedestrian gate;

- b) to have adequate warning signs, lamps, whistles, or bells;

- c) to have an adequate warning control system;

- d) to properly use the train's horn and/or whistle to warn Defendant in violation of 625 ILCS 5/18c-7402(2)(a)(1994);

- e) to keep a proper lookout;

- f) to reduce speed to avoid impact;

- g) to maintain a speed that was consistent with the exercise of ordinary care;

- h) to have a properly functioning system to prevent a crossing gate from descending and then ascending while pedestrians are at or near the crossing; or

- I) to otherwise their duties.

## 2. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable

inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

Even so, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, she must go beyond the pleadings and support her contentions with proper documentary evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In order to successfully oppose a motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, *see Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material dispute of fact exists that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A non-moving party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute. *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989). This evidence provided by the non-movant must be sufficient to enable a reasonable jury to find in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Mere allegations in the pleadings, unsupported by record evidence, cannot create an issue of fact defeating summary judgment. *Burrell v. City of Mattoon*, 378 F.3d 642 (7th Cir. 2004). The Seventh Circuit has made it clear that "self-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment." *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) as stating that "[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). However, it is possible to rebut a motion for summary judgment with the allegations of a complaint, but only to the extent that they are based upon the plaintiff's personal experience. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (requiring that allegations are admissible at summary judgment under 56(e) so long as they are "based on personal knowledge and [set] forth specific facts showing that there is a genuine issue for trial"). The fact that those statements may be "self-serving" is not a valid grounds for deeming them inadmissible. *See id.*

3. **ANALYSIS**

    a. <u>Plaintiff's Negligence Claim (Count I)</u>

        i. *Preemption/barring of adequacy theories of negligence (A, B, and C)*

To the extent that Plaintiff's negligence claim is premised on a theory that Defendant failed to provide adequate warning systems at the 123rd Street crossing, summary judgment is appropriate. It is clear that under Illinois law, liability on this basis is effectively quashed by an ICC finding that railroad crossing safety measures are adequate and appropriate. *See* 625 ILCS 5/18c-7401(3); *see also Espinoza v. Elgin, Joliet and E. Ry. Co.*, 165 Ill.2d 107, 121, 649 N.E.2d 1323, 1329-30 (1995) ("[O]nce the [ICC] has investigated a crossing and has approved the

installation of a luminous flashing signal or crossing gate device, then the installation of that device shall be deemed adequate and appropriate. A conclusive legal presumption is created which prevents plaintiffs from arguing that the railroad should have installed other warning devices."). Defendant has produced an uncontested opinion by the ICC, rendered after a public hearing, that the existing warning devices at the 123rd Street crossing were sufficient. *See* Ex. 8. Theory A, by which Plaintiff claims Defendant was negligent for failing to provide a pedestrian gate, therefore cannot be a basis for continued action in this case. However, to the extent that theories B and C – arguing the equipment's "inadequacy" – attempt to show that the equipment in place was not functioning properly, argument can still be heard.

ii. *Preemption/barring of excessive speed theory of negligence (G)*

Defendant maintains that there is simply no evidence in the record to indicate that the CSXT train was traveling at an excessive speed when it entered the 123rd Street crossing. Indeed, in his summary judgment filings Plaintiff offers no evidence or citation to support this approach. To the extent that such a claim stands as a basis for Plaintiff's theory of negligence, summary judgment is granted.

iii. *Remaining negligence theories*

As an initial matter, Plaintiff's negligence claim consistently relies on a belief that the rising crossing gate signaled that it was safe to cross. *See, e.g.*, Pl.'s Mem. in Opp. to Summ. J. at 1. For example, Michalczewski argues that he "and an eyewitness both testified that the railroad crossing gates...rose or 'ascended' (indicating to Chris that he could safely cross the tracks) even though this train was approaching the crossing." *Id.* This over-simplifies the situation, since as a matter of statutory law and Plaintiff's own understanding of safety, a rising

gate does not indicate that all is clear. *See* 625 ILCS 5/11-1011(b); Michalczewski Dep. at 98-100. Nonetheless, as a matter of common sense a crossing gate's rising is interpreted as signaling the end of danger. In any event, in light of the fact that going around or under a crossing gate at any point during its opening or closing violates public safety statute, and the fact that the gate was at no time fully raised, this Court presumes a *prima facie* case for contributory neglect against both boys. *See Hamilton v. Atchison, Topeka & Santa Fe Ry. Co.*, 175 Ill.App.3d 758, 530 N.E.2d 268 (Ill. App. 3 Dist. 1988); *Davis v. Marathon Oil Co.*, 64 Ill.2d 380, 356 N.E.2d 93 (1976).

Defendant cites to *Hamilton* in support of the argument that statutory violation warrants such a presumption. *See* 530 N.E.2d 268 (finding that plaintiff's attempt to go around a crossing gate contravened statute and served as prima facie evidence of his own negligence). Plaintiff claims that it does not apply, pointing out that in *Hamilton* "the Plaintiff violated a statute that prohibits driving around railroad gates that are in a down position," and Plaintiff therefore believes that this is different from the present scenario. Pl.'s Opp. Mem. at 9; *see also* Ill.Rev.Stat.1987, ch. 95 ½, par. 11-1201(b)). It is not. Whether or not the crossing gate was *fully* up in this instance is irrelevant, as Plaintiff nonetheless violated the applicable law. *See* 625 ILCS 5/11-1011(b) ("No pedestrian shall pass through, around, over, or under any crossing gate or barrier at a railroad grade crossing or bridge while such gate or barrier is closed *or is being opened or closed*.") (emphasis added). Therefore, *Hamilton* is directly on point and suggests that both Plaintiff and his friend were negligent and therefore responsible for their own injuries, at least to some extent. *See Davis*, 356 N.E.2d 93 (stating that violation of a law intended to protect public safety is prima facie evidence of negligence).

Therefore, insofar as Plaintiff claims that Defendant failed to uphold a direct duty to him, his claim fails as a result of the fact that his own superseding actions placed him in any danger that he faced. It is undisputed that Plaintiff was fully aware of the northbound train when he was safely standing near the crossing gate, that the train at that time was still "eight to ten car-lengths" from the point of impact, and that Plaintiff nonetheless made a conscious and deliberate decision to continue moving forward to his friend. Certainly, Plaintiff is not to be condemned for attempting to assist a friend in clear and present danger, but that does not alter the fact that Plaintiff's decision to move into that danger was his own, made despite the fact that he was alerted to both trains at the crossing.

However, Plaintiff also maintains that Defendant is liable for negligence by way of the rescue doctrine. There is little doubt that, to the extent that Plaintiff moved into the crossing, he acted as a rescuer "voluntarily attempt[ing] to save the life or secure the safety of another who is in a position of peril." *Seibutis v. Smith*, 83 Ill.App.3d 1010, 1015, 39 Ill.Dec. 359, 363, 404 N.E.2d 950, 954 (1980). The effect of the rescue doctrine, if successfully implemented, is to "extend for the benefit of the rescuer the liability which the defendant may have toward the person he has placed in peril." *McGinty v. Nissen*, 127 Ill.App.3d 618, 620, 82 Ill.Dec. 912, 913, 469 N.E.2d 445, 447 (Ill.App. 1 Dist. 1984). In fuller detail:

> If a plaintiff is injured in an attempt to rescue a third party, the rescue doctrine permits him to negate the presumption that his intentional act of rescue is the superseding cause of his injuries, thereby allowing him to prove that the defendant's negligence was the proximate cause of his injuries and to negate the presumption that he was guilty of contributory negligence by voluntarily assuming a known risk of harm in the rescue attempt. *The effect of the rescue doctrine is to extend for the benefit of the rescuer the liability which the defendant may have toward the person he has placed in peril.* Therefore, a defendant cannot be liable under the rescue doctrine unless his conduct is negligent.

*McGinty v. Nissen*, 127 Ill.App.3d 618, 469 N.E.2d 445 (Ill. App. 1 Dist. 1984) (emphasis added) (citations omitted) (relying largely on *Seibutis v. Smith*, 404 N.E.2d 950). Stated another way, "if the defendant is negligent toward the rescuee, he is also negligent toward the rescuer." *Williams v. Foster*, 281 Ill.App.3d 203, 666 N.E.2d 678 (Ill. App. 1 Dist. 1996). Application of this doctrine would allow Plaintiff to step into McKinney's place in claiming CSXT's negligence for the events of August 26.

In considering the apportionment of negligence between Defendant and McKinney, it should first be noted that the latter's tragic passing leaves the record almost entirely lacking in evidence of the victim's perceptions or degree of knowledge at the time.[4] That said, it is nonetheless clear that McKinney was not blameless in the situation. Again, evidence shows that the crossing gate did not reach a fully upright position at any relevant time. Therefore, at no time could either of the two boys have entered the crossing without violating a clear statutory requirement and, as a result, been found to be contributorily negligent. *See Hamilton*, 530 N.E.2d 268; *Davis,* 356 N.E.2d 93. This Court therefore reiterates that there is an adequate *prima facie* case of contributory negligence against McKinney.

This is *not* negligence per se. *Tabor v. Tazewell Service Co.*, 18 Ill.App.2d 593, 153 N.E.2d 98 (1958), leave to appeal denied. The *prima facie* case against McKinney can be rebutted if Plaintiff can show proof that he "acted reasonably under the circumstances, despite the violation." *Id.* (citing *Johnson v. Pendergast*, 308 Ill. 255, 262-65, 139 N.E. 407 (1923).

---

[4]To the extent that Defendant assumes decedent shared Plaintiff's knowledge of railroad safety, he is overly presumptuous. *See* Facts ¶ 17. While the two young men were apparently friends and classmates, there is no evidence that they were identical in this regard. A fact finder may make such seemingly reasonable assumptions, but this court will not do so as a matter of law.

Several facts make rebuttal difficult: the fact that the gate had not finished raising, the fact that McKinney seems to have had the time and ability to turn and see the train but did not, and the fact that Plaintiff seemed to have difficulty realizing that another train was approaching.

On the other hand, there is some indication that the safety mechanisms in place at the 123rd Street crossing were not functioning properly. First of all, the evidence indicates that the flashing lights and ringing bells that normally indicate an oncoming train stopped, if only momentarily. *See* Michalczewski 151-52 (attesting to the fact that the lights and bells had stopped); Koonce Aff. ¶ 5 (witness attesting to the fact that the lights stopped flashing before McKinney began crossing). Also, while the crossing gate did not reach a fully upright position and therefore didn't give the "all clear," it nonetheless began to rise, which could reasonably be interpreted to be at odds with the fact that a second train was clearly oncoming. McKinney took these cues to mean that the "coast was clear"; Plaintiff did not. This difference can likely be attributed to the simple fact that McKinney was several paces out front and looking to his right, while Plaintiff walked behind and might have been looking to his left. *See id.* ¶ 6 ("The [non-lead] boy was on the victim's right and slightly in back of him about one to two feet. The lead boy had his head turned to the right and slightly to the rear since both boys were talking to each other.").

It is a close call as to whether the factors listed above make McKinney's actions reasonable for purpose of overcoming a presumption of contributory negligence. However, the weighing of these factors is best left to a fact-finder. *See Duhl v. Nash Realty, Inc.*, 102 Ill.App.3d 483, 494, 57 Ill.Dec. 904, 429 N.E.2d 1267, 1276 (1st Dist.1981). Therefore,

Defendant's motion for summary judgment is DENIED with respect to what remains of Plaintiff's negligence claim.

      b.      <u>Plaintiff's NIED Claim</u>

In order to succeed on a claim for negligent infliction of emotional distress, Plaintiff must show that he: (1) was in the zone of danger; (2) felt contemporaneous fear for his safety; and (3) showed some sign of physical injury or illness as a result of his emotional distress. *Robbins v. Kass*, 163 Ill.App.3d 927, 932, 114 Ill.Dec. 868, 871, 516 N.E.2d 1023, 1026 (1987), appeal denied, 522 N.E.2d 1256.

Defendant maintains that Plaintiff's NIED claim fails as a matter of law because, under Illinois law, Michalczewski has failed to show the requisite "physical injury or illness as a result of the emotional distress caused by the defendant's negligence." Def.'s Summ. J. Mem. at 13 (citing *Rickey v. Chicago Transit Authority*, 98 Ill.2d 546, 457 N.E.2d 1 (1983)). Plaintiff counters that he has been diagnosed with severe post-traumatic distress, and that the law of NIED in Illinois finds that diagnosis to be a sufficient basis for the claim.

Plaintiff calls into question whether his NIED claim must be based on "physical injury or illness" resulting from the negligent actions in question. He states that "Illinois courts have not determined to what degree the emotional distress must physically manifest itself in order to recover [NIED] damages." It is certainly true that this requirement has been called into question. *See, e.g., Corgan v. Muehling*, 143 Ill.2d 296, 574 N.E.2d 602 (1991). However, even without the requirement of a physical manifestation, Plaintiff's NIED claim fails due to the fact that no reasonable fact finder could find that his condition rose to the appropriately severe level under the law. To the extent that Plaintiff is able to point to more outwardly visible symptoms of his

emotional trauma, his claim is still unavailing; sleeplessness, discomfort, fear, and regret are exactly the sorts of intermediate effects that consistently fail to meet the high bar of NIED impact. *Rickey*, 457 N.E.2d at 2 (declining to find sufficient injury where plaintiff evidenced "definite functional, emotional, psychiatric and behavioral disorders, extreme depression, prolonged and continuing mental disturbances, inability to attend school and engage in gainful employment and to engage in his usual and customary affairs"); *Robbins*, 516 N.E.2d 1023 (finding that a lack of medical treatment, along with crying, sleeplessness, increased migraine headaches and situational anxiety did not satisfy the physical consequences requirement); *but see Rahn v. Gerdts*, 119 Ill.App.3d 781, 74 Ill.Dec. 378, 455 N.E.2d 807 (1983) (suggesting that the *Rickey* standard supported the plaintiff's cause of action where the complaint alleged that the plaintiff had been admitted to the hospital and treated for severe depression, anxiety and nervousness); *Allen v. Otis Elevator Co.*, 206 Ill.App.3d 173, 183, 563 N.E.2d 826, 833 (Ill.App. 1 Dist. 1990) (finding insufficient "continued distress, nervousness and sweaty palms when on elevators, have fears of heights or crowds, and, although they have taken elevators and airplanes since the incident, they have taken some actions to avoid taking elevators or using airplanes as a means of transportation").

Post-traumatic stress disorder, whether severe or not, is the type of purely psychological damage against which Illinois courts regularly grant summary judgment. The severity of Plaintiff's symptoms are significantly undercut by the fact that he did not find it necessary to visit with any medical professional concerning the emotional fallout from the accident until several years after the fact, and does not continue to do so. For these reasons, Defendant's motion for summary judgment is GRANTED with respect to Plaintiff's claim for NIED (Count II).

## 4. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff is instructed to substantiate his claim as to the jurisdictional amount, in writing, within fourteen days of this order.

Enter:

/s/ David H. Coar
_____
David H. Coar
United States District Judge

Dated: **September 28, 2007**